The third case on our docket this morning is 23-60014, Perez-Ordonez. Mr. Silva? Yes, ma'am. Good morning, Your Honors. Will you please report? My name is Christian Silva and I represent the petitioners in this matter. This case presents three separate issues. The first issue is whether the petitioner has a well-founded fear of future persecution on account of a protected ground. In this case, in particular, it would be political opinion. The second issue is whether it would be reasonable to expect the petitioner to relocate multiple times within Guatemala in order to avoid that persecution. And the third issue is whether the petitioner is able to avail herself to the protection of the Guatemalan government, or a set of other ways, whether the Guatemalan government is able and or willing to protect the petitioner against the persecution. Mr. Silva, can I ask you about the second point about the relocation piece? Yes, sir. I mean, the government says that you did not raise this before the BIA in your brief. I don't see the issue raised. So I guess I want your reaction to the government's argument on that point, but a second part of that question is I'm also wondering whether that matters because the IJ found that because you didn't show past persecution on account of a political opinion, the burden then shifted to you to show that you could not relocate. So I'm wondering, I'm just wondering about that particular issue since. Yes, yes, Your Honor. I'll address your first issue. Your Honor, the BIA adopted the order and the decision of the IJ pursuant to the matter of Urbano. And as a result, in accordance with this court's opinion in Paredes v. Garland, by adopting the IJ's decision on the matter of Urbano, the BIA effectively preserved the IJ's decision for the BIA. Okay, so you're saying the IJ addressed it, the BIA adopted it. Exactly. All right. All right. So, I mean, I did, but I didn't see it. I guess I see. All right. You are correct, Your Honor, that it was not, that particular issue was not spoken to regarding the. Yeah, it wasn't raised before the BIA. I get it. But then my second point is, okay, I get that point, but my second point is what I'm wondering what the effect on, let's say, I guess I'm not asking it well. I'm wondering if it really does, the IJ said because you didn't have a show past persecution on account of a political opinion, then you bear this burden. So I'm wondering if we disagreed with the IJ on that point, if all of a sudden it kind of changes up the calculus, because the fact is there is evidence in this record about relocation and it supports you. That's correct, Your Honor, and that was going to be one of my points further along my presentation, but I'll address it at this time. Your Honor, the IJ acknowledged that my client and her children had relocated to another town within the country of Guatemala. However, I suppose that the IJ didn't feel that it was far enough because it was only an hour away from where the persecution had taken place. But really the crux of the IJ's decision with respect to that issue, and I'll quote from the IJ's decision is, While respondent testified she previously did not move in with her sisters in Santo Domingo because she believed doing so would endanger them, respondent failed to explain why it would not be reasonable for her to live with her sisters after being outside of Guatemala for one and a half years. So that's the basis of the IJ finding a lack of internal relocation against my client. I mean, is there evidence of where do her sisters live? That's a great question, Your Honor, and that is exactly one of my arguments. Your Honor, if you look at the regulations in the case law, in order to determine reasonableness, you have to take it as a totality of circumstances test. And the regulations provide several factors that have to be taken or should be taken into account in determining the reasonableness. For example, the size of the country, the last habitual residence, the geographic locus of the persecutor, the size, reach, and numerosity of the persecutor, and the petitioner's demonstrated ability to relocate to the U.S. Your Honor, the IJ questioned my client extensively on many issues in this case, but in particular, he questioned my client about her sisters. Where are their sisters? How many sisters were there? Did she have other siblings? But never, never did the IJ pose any questions to my client for the application of those factors. In other words, she didn't ask the geographic location of Santo Domingo. Santo Domingo could very well be only 20 minutes away. And if that's the case, then it actually undercuts his ruling because 20 minutes away is a lot shorter than one hour away. And the only evidence I saw with respect to relocation was her testimony that she relocated an hour away. Correct. And then began receiving death threats by phone. Correct. Maybe the government can tell me if there's other evidence with respect to relocation, but I didn't see anything beyond that. And if I may just continue to that point, Your Honor, the reason why I raise it is because the IJ failed to take evidence and create a record for his decision. His opinion in saying that my client was not reasonable in relocating to live with one of her sisters because he didn't ask the problem. He didn't ask the right questions. Why is this the IJ's duty as opposed to y'all's duty? It was your burden because it was not a past issue, so it's y'all's burden to show that you can't relocate. Correct, Your Honor. No, it's not the IJ's burden. The IJ's burden, obviously, to consider it, but not to ask the questions. That is correct, Your Honor, and I believe that we did meet that burden because my client did relocate an hour away. Well, but the IJ did not think that just getting calls and nothing further happened was enough to show that it was dangerous to be somewhere else. I mean, you can get a call anywhere in the world. I get random calls sometimes from places in other countries. So do I. So, okay, so does that mean something? I mean, no, but nothing else happened. Getting a call by itself was not something the IJ considered to be sufficiently dangerous to say that that move an hour away was a problem. Well, the importance of the calls, Your Honor, is that were threatened calls to begin with. Secondly, the calls came from the gang members themselves. No, I understand that, but they didn't do anything. They just said, we're going to get you. So they're trying to keep her from doing anything more against them probably with that. But they didn't come after her an hour away, which would have been easy enough, I'm assuming. I haven't driven around Guatemala, but I'm assuming it's easy enough. But they didn't. They didn't do anything other than just call and threaten her to keep her from doing anything more against them. Well, I believe she didn't want to take the risk. Well, that's always true. How many members of the council had been murdered at that point? Before she departed to the United States, three members had been murdered. As of today, well, as of today, it's been four altogether. I don't know in the past year and a half since we had the individual hearing with the IJ what other council members have been murdered by. But she's obviously not still on the council. She's obviously not still on the council because she left. But let me ask you about that. Is it your position that anything a council rules is political? Yes, Your Honor. Okay. And what case is your best case on that? Yes, Your Honor. So I finally ruled 28J a letter where I cited to several additional authorities. And the first one is a Second Circuit case from 2001, Celaya Moreno v. Wilkinson. And in that case, the court indicated or stated that an action ought to be directed at a governing institution to qualify as a political opinion. Can you tell me that? Can you say that again? I'm sorry. Yes, ma'am. Celaya Moreno. No, but the sentence you just said. Oh, yes, yes. An action ought to be directed at a governing institution to qualify as a political opinion. This is extremely important because the community council is a governmental entity. It is an entity that was enacted by the Guatemalan Congress for the specific reasons of governing and administering the affairs of the local town and make decisions. Here are the issues that affect its citizens. And in their official capacity as empowered by the Guatemalan Congress, they passed a resolution to expel the gangs from their town and prevent them from taking control of the entry and exit points, which is generally what the first step that gang members usually take to take control of the town. And so that act in and of itself is inherently political. It is by nature political. Here's what the IJ said in response to that. I just want to read this because I couldn't believe my eyes when I did. The evidence of record does not demonstrate that respondent had a political motive for wanting to expel gangs from her community or that she supported the measure to guard the village entrance due to political opposition to the gang's causes. So I didn't write that. The IJ wrote that. So maybe it would have been a political motive if she didn't agree with the gang's politics, but she was in disagreement with the gang's murder of people. I just don't even know what to say in response to that. It's a friendly question. To the extent it's a question, I just I'm amazed at that. And I agree with you, Your Honor. I agree with you as well. The very nature of the community council as a political entity or an agency of the Guatemalan government was to make decisions and pass resolutions. How big is this town, do you know? It's about 400 people. 400 people. There's a community council that makes decisions, and one of the decisions they made was we don't think MARA 18 should be around murdering people. So somehow there's a way of barring them, and that's the decision. But the IJ felt that that needed to have a political motive for that decision. Right. And I believe the IJ characterized it basically just as a criminal motive on the part of the gang members. But, you know, my position Well, if somebody is arrested for murder, is that considered political? No, Your Honor, because that's a crime. Okay. Right. But your statement is anything a council does is political, even when it is dealing with safety issues as opposed to, oh, we don't agree with this group's religion or with their position on abortion or whatever. No, my argument is that anything that the political entity acts on in its official capacity in furtherance of the reason for its existence and the reasons for why it was created, that that in and of itself is a political act. Do you have any Fifth Circuit cases on that?  No, Your Honor. I did not find Fifth Circuit cases. There is another Second Circuit case as well. And that is Zang, Z as in zebra, H-A-N-G versus Gonzalez. And in that case, the court stated the important question for determining the nature of the applicant's oppositions, whether the applicant's actions were directed toward a governing institution. So, I mean, here we're seeing courts basically saying a government institution, the acts— The applicant's acts are directed towards a government institution. She's the applicant, and she is a government institution. Yes, but the other side of the coin is if you have an apolitical individual, an apolitical organization that acts against a government institution because they don't like what the government passed, that that's political in and of itself because you're dealing with the government. Well, you're just saying if you oppose—we've had—I'm pretty sure there's case law that you're just a citizen and you're scared of gangs and you oppose the gangs and the gangs retaliate against you. We have said that's not political. That's gang violence. But you're saying if you're on a council and you oppose the gangs, then it is political. So, members of the government who oppose gangs can seek asylum or whatever, but not individual citizens who oppose gangs. Well, Your Honor, and that's one of the points I was going to discuss. Most of the cases, if not all, at least that I have found in this circuit and in other circuits around the United States involve three different types of—that involve gang members in political asylum cases. Alleging persecution based on anti-gang or opposition to gangs involves three different sets of facts. One is extortion where the gang is extorting the private individual and the private individual either doesn't have the money or can't pay it and refuses to do so. The second is recruitment where the gang is recruiting a male in order to have that person perform its dirty jobs for him. Sometimes you can see that also in the context of a female where they recruit females in order for the female to be the lady friend of— I mean, I've seen plenty of cases. Believe me, we see a lot of cases with respect to gangs, especially MS-13 and this one, MARA, and whatever it's called, M-18. I have to say, though, I have never seen a case where a member of a council like this is targeted because of a political resolution. That is by definition political. A political resolution to expel the gangs. Correct. And then they start bumping off the council.  I have not, Your Honor. And that is why this case is unique because it's not a particular set of facts that has been presented to this circuit. And at least from what I found, have not been presented in other circuits. And I think that's what makes this case unique and I believe different than all the other cases that have been presented in the appellate courts in the United States. Is that right? I'm sorry. I apologize, Your Honor, for passing my time. That's right, right? Yes. You've stayed for time for rebuttal. Okay. Thank you. That's what that red dot means.  No, I just—it's kind of hard to tell. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the court. Ashley Arthur with the Attorney General of the United States. I want to clarify what is properly before this court. Petitioner waived several issues in her opening brief by not raising them. She raised the issue of past persecution, the issue of a confidential particular social group claim. Can you speak up? I can't hear you. I don't have the brief in front of me, but I thought her brief contains arguments that being threatened by gang members to kill you and your children is sufficient to amount to persecution. I thought there was quite a bit of argument about that, so I don't understand the waiver argument. There's no nexus here. Between what? Between the harm she experienced and fears in the future and a protected ground, which is a political opinion. So, as I understand it, I will just repeat, just to sort of be blunt about it, that we see many, many, many of these cases. I have myself written opinions with respect to MS-13, and this one stands out to me. And the reason it does is because the IJ found the testimony credible. And the testimony, as I've read it, is that the petitioner served on a local council of a very small town. They passed a resolution to exclude Mara 18 from the town, and Mara 18 began to bump off to kill the members of the council. And I was struck by many things in the IJ's opinion, but the one that I've already read, what struck me the most is that the retaliation against the petitioner was not for a political reason, because she didn't have a political reason to expel the gangs. But, of course, she did. By definition, what she was doing was political. She was on the council. She enacted a policy to expel the gangs, and the retaliation came as a result of that. So, that's what stands out in my mind about this case. I have two points that I would like to say about that. First, with regard to the council, this is a council that she was required to join for her son's school. It's a community, PTA rather, a council that discussed expanding the school, other infrastructure issues, discussed current events like the gang causing problems in their community. And while she voted to have a couple of people guard the gate, the only entrance to the community, this does not demonstrate a political conviction on her part. The IJ is misunderstanding the word political. There's no evidence that the gang imputed was aware or knew of her connection to this council. We know why the gang targeted her, because they told her so. They said, we want you to stay quiet about these crimes that you witnessed. Do not report. Do not testify. And it's well-trotted ground that criminal motive to avoid criminal prosecution and to intimidate and have witnesses stay quiet is not a basis for asylum, Your Honor. The members of the council that they sent to guard the gate were murdered. Right? There are some, the evidence reflects that there have been some council members that were murdered. There's about 30 plus council members, two or three of them who were guarding the gate were murdered. But that's about them. And this is about her and why the gang targeted her. And there's no evidence that they were aware of her participation in the council or cared. They only started to bother her after she witnessed these murders. And this was, I think, the timeline she joined this council around, the school required her to join around September 2017. And it wasn't until January 2019, when she witnessed these murders, that they began threatening her. And none of the threats mentioned her council membership. It was all about do not testify, do not report. And then as for relocation, as responded... Are the meetings of the council public meetings? They're held at the school. Anyone is invited to come observe and participate, presumably. Her participation was fleeting at best. There were about 15 meetings over the course of 15 months she attended for. And simply opposing gang violence or having a moral opposition to... As an official, though, as a political official. We have plenty of cases that say merely opposing gang violence isn't a political opinion. But this is as an official on a council that was enacting policies. And look, I'm responding to the IJ's sentence here. The evidence of record does not demonstrate that Respondent had a political motive for wanting to expel gangs from her community. And I just fail to understand that. I believe the IJ is trying to make the point that the gang's motive is purely criminal because they wanted to expand their territory. And this is the only entrance to this community. Let me ask you this. Are you distinguishing between some entity that you're saying is more like a club within the school, like a PTA sort of club, than from, say, Congress, where we elect them, or maybe some other entity where they're appointed. And you're saying those are political, but this one really isn't because she's just joining as a parent and being told to do that, but isn't like being appointed or elected or whatever. Is that, I mean, is there some distinction between this council and, say, a city council or a school board that's elected or appointed? That can matter. The most important issue is whether the gang computed that onto her. But at page 29 in our brief, we do provide some examples of when a political opinion can be discerned. And that's from the Matter of Indemnities case. And they give examples such as classical political activities, being active in a political party, founding a political party, attending or speaking at political rallies, writing or distributing political materials. I'll follow up on that. If I'm a politician and I go to a political meeting and I say, I am against the gangs in this community and I want them expelled. Public meeting. After that happens, some members of the council begin being murdered. And then someone's beating on my door in the middle of the night and says, I'm going to kill you and your children. Now, why isn't that being persecuted for a political reason? Because we have no evidence the gang knew about her role or her participation, Your Honor. There is evidence, I'm looking at it right now, that says these meetings were public. People knew who participated in the council. People in Merton were recognized as part of this group. They ordinarily knew who supported what measures. So there's evidence that this was very public. There's also evidence that Petitioner herself didn't know the names of her fellow council members or the names of the victims. So she may have recognized her fellow committee members. But, again, the threats had nothing to do with the connection to her council. There's no evidence that they were aware or cared. If there were, would it then be political? If there was evidence in this record, which there's not, that the gang made threats about her political voting or opposition to them, then perhaps, but that's not the facts here. At the meeting, respondent recognized two people, Sal Lopez and Anania Velazquez, the latter being the council president. Now, later on, the testimony is that Sal Lopez was found floating in a river. Yes. Dead. I would like to point out, too, that while she received a phone call from this council president telling her that Ruben, another council member, was eaten and thrown in the river, this certificate that she submitted shows that he died of a disease associated with gallstone complications. So the same guy saying this about Ruben. The IJ found her credible. Yes. Even taken as true, though, it's not persuasive evidence. Being died, the Supreme Court being died says that credibility doesn't guarantee a legal victory. I mean, you might think someone died of being murdered, and it turns out they died of something else. That doesn't make you lying. You're going based on what you think. But then the actual finding is that it was some other reason. Is that what you're saying? Yes, Your Honor. Here we have her testimony, and her testimony alone was not enough. Put another way, an applicant must demonstrate that the persecutor would not have harmed the applicant if the protected trait did not exist. And that's a matter of anonymity. And here, the gang did not start threatening her, bothering her until almost, I believe, a year and a half later. And once she had joined the council, she happened to witness two murders. All of the threats pertain to don't talk to the police, stay quiet, don't testify. That's because they wanted to avoid criminal prosecution or consequences. And that is not, criminal motive is not a basis for asylum. And while… I have a slightly different issue. The IJ said that gang members threatened respondent four times. Once they arrived at her house, banged on the door yelling expletives and threatened to kill her and her sons. Then she received three threatening phone calls during which callers who she believes were gang members threatened to harm her. But the IJ found that this did not rise to the level of past persecution. Do you support that? Well, past persecution, Your Honor, as we argued in our brief, petitioner waived that issue by not raising it in the open brief. Let's assume I disagree with you on that point. Because I'm just sitting here remembering the arguments from the brief. And so, do you agree with the substantive determination of the IJ that that does not constitute past persecution? She was never physically harmed. And in fact, when she did move an hour away… What is your best case for the proposition that banging on the door in the middle of the night and asking and threatening to kill you and your children is not past persecution because you weren't physically harmed? Say that again. Because you work as a… Do you have any authority for that argument? Because of her connection to the counselor? No physical harm. Sure, she was threatened with death and her children were threatened with death. But no physical harm. So therefore, there's no past persecution. Well, it is a case-by-case analysis. But this court, and I believe it's Vasquez-Guerrera, which is… We start discussing this at page 26 and 27 of our brief, as well as a third case. Those cases stand for the proposition that threats motivated by criminal intentions do not provide a basis for asylum. And all we have is her testimony alone. And there's no evidence. It's sympathetic and it's a sad situation that she wants to escape gang violence. But that alone is not a basis for asylum. And without more of any proof that the gang is aware or cared about her counsel participation, it really seems like, even based on her own testimony, when she was asked if a gang member ever approached her and said, we're going to harm you because of your participation with the counsel, or just briefly mentioned it in passing while they were delivering these threats, nothing had to do with her counsel participation. There's 400-plus people in her town, 30-plus counsel members. She was able to have a sister go and find Ruben's death certificate. Her sisters, she has more than one sister, apparently. None of them have experienced any harm, even when the one sister went to get Ruben's death certificate. And petitioner provided no declarations from anybody. No other evidence other than her own testimony and then this death certificate, which undermines her claim that Ruben was murdered by the gang. Because the death certificate says it was gallstone complications. So even taken as true... Weren't there more people on the council who were murdered by the gangs? Taken as true, yes, but we have no evidence that can definitively say or compel the conclusion that this is why, because of their counsel participation. Did she testify that she witnessed one of the bodies being pulled from the river and it had machete marks on it? She did testify to that, but we do not know, so the evidence does not compel that the reason was because of their counsel participation. If it was... I'm not sure that there's any fact... I mean, there's not exactly a factual dispute here. It's really, we know the facts. We know what happened. And the question is, do the facts show that she's being targeted because of a political opinion? And the IJ says, no, it's not a political opinion because she didn't want the gangs expelled for political reasons. Petitioner was asked and provided the opportunity to articulate a political opinion. And when asked, did you show... This is at page 210 in the brief, rather the record. She states, quote, to do the best we could because as much as there were bad people in the government, there were also good people in the government. So we would try to do things best we could, end quote. This is pretty underwhelming evidence because there's no other affidavits or declarations in her own testimony. Was she testifying through a translator? She had a translator and she was represented by counsel. What do you think she meant by that? I don't know, but she was represented by counsel and the record does not compel the conclusion she has some strong political conviction. So there's no nexus here. Now, the issue that they raise is the future, did not raise the past. You said that past was waived and they didn't file a reply. So I'm not understanding how that issue is before us. The issue of past persecution is not before us. This discussion of why... ...say that that issue is raised, is waived, past persecution. Past persecution is waived because she failed to raise it in her opening brief. So if I look at the arguments that say, for example, threatening with death is enough to show past persecution, hasn't she preserved that? You're saying inadequate briefing? Our position is that past persecution, social group, withholding and CAT are all waived. The issue is that the BIA commit legal error when it adopted entirely the immigration judge's determination that petitioners had failed to establish that they were unwilling and so on due to a well-founded fear of future persecution. And then that's their summary of the argument. I mean, I'm not reading every single page, so I'm certainly not disagreeing with Judge Duncan, but their argument is future. That's their issue. Their other issue is this thing about relocation. Which is unexhausted. That's the government's position. The IJ said in its opinion that because, this is page 102, because she has not established past persecution on a protected ground, that's the political point, comma, respondent also bears the burden of establishing that it would not be reasonable for her to relocate to another area of Guatemala. So if hypothetically I disagreed with you that she did in fact establish past persecution, then wouldn't that change the burden? She would no longer bear the burden of showing that she had to relocate. She could relocate. I guess I don't understand your question, Your Honor, because if she doesn't raise it in her opening brief, and it's waived, and the court disagrees that she waived it, I don't know how, because she didn't raise it in her opening brief. She briefed it. That's how. The only evidence with respect to relocation in this case is her own testimony that she moved away an hour, and then continued to receive death threats by the telephone. How could one say that there's no, I just, that's the only evidence with respect to relocation in the record. So past persecution and relocation are, so we argued that past persecution is waived. The court may disagree with that, but the internal relocation issue, she did not raise it in her PII at all. And so the government's position is that was not properly exhausted. And because the government's raising it, if a party raises it, and that under Santos-Zachariah, that should be enforced as a mandatory rule. So the court doesn't need to reach it, but also the court still doesn't have to reach it, even if the court disagrees with the Santos-Zachariah argument because nexus is dispositive alone. And the government feels that the court's analysis could end at nexus. And then the third option is if you heard the first two, if you finally get to relocation, we think that moving, as the IJ noted, she moved only an hour away. Sisters have experienced no problems. And there was no in-person threats when she did move. And there is no evidence of any nexus here. So threats that are just verbal, they never acted on them. There's no in-person threats when she moved. And there's no evidence that the gang was aware of her participation. And this is counsel. And therefore, the government contends the easiest way to dispose of this case is to uphold the nexus finding. She does say on, she says a lot of things. She says on, fairly pointedly, on page 14 of her brief, that the counsel's president had told her that gang 18 had threatened him directly and told him that everyone from the community council would disappear or be found dead because of their decision to vote against allowing the gang 18 from entering the town. And she goes on at length about the history of all this. That does seem that she's talking about past persecution. The government's interpretation of her brief was that the gang's actions and the information she has and has heard from this council member go toward her fear for the future persecution. And has she established a claim that compels a conclusion contrary to the agency? Whatever facts she gives, she didn't argue that the past persecution was incorrect, the finding of no past persecution. So sending out a bunch of facts and then not arguing that, I don't think is preserving the error, if any. Here's page 23 of her brief. I quote, targeted death threats amount to persecution, citing to a Fourth Circuit case. A credible death threat by a person who has the immediate ability to act on it constitutes persecution, regardless of whether the threat is successfully carried out, citing an Eleventh Circuit decision. Okay, and this is under the well-founded fear of future persecution argument. That's the argument she made. I think that also would implicate a problem that she also raised the issue of whether her fear was objectively reasonable, which the agency did not reach. And so this court could not reach that either. And that's why our position is that this case should be dispelled on the next issue. And even taken as true, what happened to these other council members, what matters is her and what the gang knows about her. And right now, from the record, the government's position is that the motive is purely criminal. They wanted to avoid criminal prosecution. They wanted to avoid consequences. It's a retaliation, vengeance, be quiet, stay quiet. And while it is sympathetic that she wants to escape gang violence in these conditions, this motive by the gang is purely criminal. And her desire to escape gang violence in Guatemala, which is admittedly a country that's grappling with so many issues, with unruly criminals and gangs, it's not a basis for asylum. Your time's expired, thank you. So if there are no further questions, your honors, I will conclude. Your time's expired. I'm sorry, what? Your time has expired. Oh, okay, then I conclude. Thank you. Your honors, with respect to the argument that the gang members could not have known that she was part of the council, as you pointed out, your honor, there is more than enough evidence in the record indicating that all council meetings were done in public. Did you make a claim that the past persecution conclusion was erroneous in your brief? I'll be honest with you, your honor, no, I did not. Okay, thank you. Now, tell us about why the threat on the phone was enough. To put her in harm, having relocated. Well, it's not just the threat on the phone, your honor, it's the fatality of the circumstances in the entire record. It's the fact that we have four council members who have been murdered. Two of them were beaten. Just one thing I'd like to address is regarding the cause of death of Ruben Ramos that my esteemed colleague indicated that it was as a result of gallstone, but that's not the case. The record indicates that he died of a pancreatic hemorrhage. The whole gallstone idea arose from DHS council, who I would suspect probably did a Google search on what can cause pancreatic hemorrhage. Well, if you do a Google search as well, you'll find that a pancreatic hemorrhage can be caused by a blunt force as well. So the totality of the evidence here, the way that the council members were beaten, two of them with a machete, the other one was beaten to death, shows a specific intent to punish. It's not a... But was anybody killed who wasn't at the gate? No, the only two people who were killed were the council members. No, but I'm saying that were standing at the gate, protecting the gate. I thought that's when they were killed. That's when they were killed. Right. I don't recall the record indicating that there were any other persons aside from the council members at the gate. Okay. But what I'm saying is your client was not protecting the gate. I mean, voted on it, I understand that, and I respect that, but not... Isn't there a difference between just kind of voting on something with a bunch of other people versus standing at a gate and protecting the gate? Well, it's correct. She was not standing guarding the gate, but as part of the council, a member of the council, eventually had to stand and guard at the gate because that's the resolution that the council had passed, which was to stand guard, to have two to three council members stand guard at the gate. What about going forward? What's happening there now? If she went back today, and I'm not saying she will, but if she did, would there still be the gate and still having to defend it or whatever, whatever? As of the time that she testified in the individual hearing, which was in 2020, they were still attempting to enforce the resolution that was passed and attempting to prevent the gang from taking control of the town. And the murder of Ruben Ramos had taken place, which, again, he was beaten to death, thrown in the river. Let me ask you this. Can every member of the police force in Guatemala successfully get entry into the United States and stay here because of fear of persecution? No, Your Honor. Why not? They're officials. They are opposed to gangs. They're politically opposed to it. That's their job. They're beaten. They're killed. They're afraid they're going to be beaten and killed. They have to fight the gangs. Why can't they, on the same basis, say I'm entitled to asylum? Well, the courts have held that police officers have assumed the risk of their job. And so that any act that they take in pursuit of that... What about the president of the country? The president of the country? If he were killed? He's threatened. He said, I'm against the gangs. I want asylum. I believe that that would be a political opinion. He didn't assume the risk by taking the job? Well, he didn't assume the risk as a combatant. And the cases have likened police officers as combatants in the military where they are already assuming the risk by virtue and nature of the job itself. So every member of the legislature, every political person who holds political office in Guatemala and says I'm against the gangs is entitled to asylum in the United States. That's your position? Well, it's not just saying that they're against the gang, Your Honor. It's that a resolution was passed. They vote against the gangs. They vote for laws that... Well, if the gangs start to knock off the congressional members that voted in favor of that law, my argument is that it is based on a political opinion. Yes, Your Honor. And I see my time is up. Thank you so much. I appreciate your time and consideration. Thank you.